44667. BRYANT v. RUCKER et al.

Hall, Presiding Judge. Plaintiff appeals from a summary judgment for the defendants. Plaintiff had brought her children to play at the home of defendants, who were family friends. This was not her first visit to their house. The carport was wet from water which the children had splashed out of a small swimming pool. One child had already slipped there the same day, but defendants did not warn plaintiff of the wet condition or the previous fall. Plaintiff slipped.

The law of Georgia and the decisions of this court hold that a social guest in a defendant's private home is a bare licensee. *Stanton v. Grubb,* 114 Ga. App. 350 (151 SE2d 237) ; *Laurens v. Rush,* 116 Ga. App. 65 (156 SE2d 482) ; *Hall v. Capps,* 52 Ga. App. 150 (182 SE 625).

" 'If plaintiff is a social guest in defendant's home, the great weight of Anglo-American authority classifies him as a bare licensee, even though he was expressly invited. [Ann. 25

ALR2d 598]. This classification is often invoked to deny the host's liability for harm caused by a concealed danger that he did not know of, but which would have been discoverable by inspection. . . Such a limitation of duty probably conforms to people's reasonable expectations in the ordinary host-guest situation. If the host is the kind of person who does not inspect and maintain his property on his own account, the guest scarcely expects an exception to be made on the occasion of his visit. In this country, moreover, where most social contact is among people who are on a similar economic footing, the host is usually in no better position than the guest to absorb or distribute the loss.' 2 Harper & James, The Law of Torts 1477, § 27.11. 'He does not come as a member of the public upon premises held open to the public for that purpose, and he does not enter for a purpose directly or indirectly connected with business dealings with the possessor. The use of the premises is extended to him merely as a personal favor to him. The explanation usually given by the courts for the classification of social guests as licensees is that there is a common understanding that the guest is expected to take the premises as the possessor himself uses them, and does not expect and is not entitled to expect that they will be prepared for his reception, or that precautions will be taken for his safety, in any manner in which the possessor does not prepare or take precautions for his own safety, or that of the members of his family.' 2 Restatement of the Law, Torts 2d 175, § 330." *Laurens v. Rush,* 116 Ga. App. 65, 66, supra.

The factual situation of the *Stanton* case, supra, is nearly identical with this case. In *Stanton* the water was tracked into the basement by other guests coming from the defendant's swimming pool. In this case the water was splashed in the yard outside the house by children.

This court has held, even as to a *business invitee,* that a business proprietor cannot reasonably be expected to prevent the presence of some water on a normal floor during a period of time when it is continually raining. *Gibson v. Consolidated Credit Corp.,* 110 Ga. App. 170 (2c) (138 SE2d 77); *Card v. Chi-Chesters Baconfield Pharmacy,* 111 Ga. App. 358 (141 SE2d 790); *Angel v. Varsity, Inc.,* 113 Ga. App. 507 (148 SE2d 451). If a business proprietor is not required to be continually mopping up rainwater inside his store to protect a

business invitee, it ought to follow that an owner of a private home is not required to be continually mopping up water around his swimming pool outside his house to protect a social guest.

This is not a case of hidden peril, pitfall or mantrap. *Crosby v. Savannah Electric &c. Co.*, 114 Ga. App. 193, 198 (150 SE2d 563).

*Judgment affirmed. Bell, C. J., Jordan, P. J., Eberhardt and Whitman, JJ., concur. Pannell, Deen, Quillian and Evans, JJ., dissent.*

SUBMITTED SEPTEMBER 11, 1969—DECIDED MARCH 16, 1970.

*Paul C. Myers*, for appellant.

*Nall, Miller, Cadenhead & Dennis, Douglas Dennis, Baxter L. Davis*, for appellees.

PANNELL, Judge. I am authorized to state that Judge Quillian and Judge Evans join in this dissent.

The majority has failed to concern itself with rules applicable to motions for summary judgment by a party defendant on whom the burden of proof does not lie upon the trial of the case but on whom it does lie when such defendant makes a motion for summary judgment, and this is such a case; and has also failed to call attention to, and has failed to consider, pertinent and controlling evidence such as, for example, that the defendant husband had placed a sharp metal object next to a puddle of water which created a slippery condition on the floor and his daughter had very recently slipped in this same puddle of water, all of which he knew as well as his wife. For these reasons, I do not deem it amiss that the complete pleadings and all of the material evidence be included in this opinion.

Mrs. Peggy Bryant brought an action against Eugene R. Rucker and Florence Rucker alleging: "1. The defendants above named are husband and wife and reside at 3371 Brookfield Lane, DeKalb County, Georgia, and are subject to the jurisdiction of this court. 2. That at all times pertinent hereto defendants were the owners and occupants of a dwelling house situated at the above address. 3. That said dwelling of the defendants at all times pertinent hereto had adjacent thereto a

carport with a smooth concrete floor surface. 4. That on July 10, 1967, plaintiff was a guest in the defendants' dwelling at about 5:30 p.m. and was walking on the paved surface of the carport aforesaid. 5. That, unknown to plaintiff, the paved surface of the carport was in a slick, hazardous and dangerous condition due to water which had been spilled or placed thereon by defendants or by persons whose identity is unknown to the plaintiff but well known to the defendants; that said slick, hazardous and dangerous condition of said pavement was fully known to the defendants by reason of the fact that immediately prior to the incident and injury to the plaintiff hereinafter complained of, the daughter of the defendants had fallen on said slick pavement; that defendants knew of said fall. 6. That said slick and hazardous condition of the pavement was unknown to the plaintiff and could not have been discovered by plaintiff in the exercise of ordinary care; that plaintiff had no knowledge of the fact that the defendants' daughter had fallen by reason of said slick pavement nor did the defendants advise the plaintiff of such fact. 7. That as plaintiff was walking across said wet, slick and hazardous pavement, she slipped on same and fell upon a sharp and dangerous piece of sheet metal which the defendants had placed in the immediate area of said wet and slick pavement a few minutes prior to the time of the plaintiff's fall. 8. That said sheet metal severely lacerated the posterior portion of plaintiff's right thigh, causing a six and one-half inch laceration in the skin thereof which required 64 sutures and which caused the plaintiff great pain, suffering and disability; that said laceration caused a permanent scar and keloid formation and has caused the plaintiff great anguish and humiliation. 9. That by reason of said injury plaintiff sustained great expense for medical attention and treatment and will amend this complaint to set same forth with full particularity prior to trial thereof. 10. That at all times pertinent hereto and immediately prior to the time of the plaintiff's fall as aforesaid and at the time of said fall and as the plaintiff was walking across said carport pavement, the defendant, Eugene R. Rucker, was standing in said carport area within a few feet of said slick and dangerous area of pavement and there existed

no facts by reason of which the said defendant Rucker was prevented from giving to the plaintiff a warning concerning the wet, slick and hazardous condition of said pavement; that the defendants, including the said Eugene R. Rucker, wilfully failed to give the plaintiff any warning whatsoever of said wet, slick and hazardous condition of said pavement despite their actual knowledge thereof and despite the fact that the defendant, Eugene R. Rucker was then and there present and could have given the plaintiff a warning of said hazardous conditions without the slightest difficulty; that by reason of defendants' actual knowledge of the wet, slick and hazardous condition of said pavement, the defendants' omission to warn the plaintiff of said hazardous condition, constituted a wanton and grossly negligent disregard for the plaintiff's safety. 11. That by reason of said injuries, pain and suffering plaintiff was damaged in the sum of $15,000. 12. That all of said injury and damage to the plaintiff was proximately caused by the negligence of the defendants in the following particulars: (a) In that defendants failed to warn plaintiff of the wet, slick and hazardous condition of said paved floor despite their actual knowledge of said condition. (b) In that defendants placed said sharp and dangerous piece of metal in the immediate area of said wet, slick and hazardous portion of said pavement, or allowed said dangerous object to remain in said location, knowing of the slick and hazardous condition of said pavement, thus increasing the danger of injury to the plaintiff. Wherefore plaintiff prays and demands that a summons and process issue to defendants, requiring them to appear and answer hereof according to law and that plaintiff recover judgment against defendants in the sum of $15,000 and costs hereof." The answer admitted paragraphs 1, 2 and 4 of plaintiff's action but denied all other paragraphs of the petition material to this case.

The defendants filed a joint motion for summary judgment based upon the pleadings and the deposition of the plaintiff taken by the defendants for the purpose of discovery and no other evidence or material was produced by either party. The deposition, so far as here material, is as follows: "Q. Let me call your attention to the date of July 10th, 1967, and ask you

if you had occasion to visit Florence Rucker and Mr. Rucker on or about that date at 5:30 p.m.? A. Yes, I did. Q. How long had you been knowing them? A. Roughly two years, three years. Q. How did you meet them? A. They lived across the street from me where I lived at one time. Q. How yould you describe your acquaintanceship with them, were you real close friends or just casual friends or what? A. We were good friends. Q. You would visit their home and they would visit in your home? . . . I just wanted to know whether or not the children [the plaintiff's and defendants' children] played together or not. A. Yes, they played together. Q. Now, you went to visit them at their home, is that right? A. Yes. Q. And where was that? A. Brookfield Lane, I'm not sure of the number. Q. Had you been there before? A. Yes. Q. Had you been there many times before? A. Yes. Q. When you arrived at the Ruckers', tell me where did you first go and who did you see? A. Her husband was on the carport and her little girl was up on the carport also, the one that is my little girl's age. Q. What is her little girl's name, do you know? A. Joan. Q. All right, Mr. Rucker and Joan were in the carport, all right, go ahead, what did you do and where did you go? A. I asked him where Florence [Mrs. Rucker] was and he said that she was out in the backyard. I looked out and saw her. She said, 'Come on back.' I started back there. Q. Can you describe this carport for us, or do you have any pictures of it or anything? A. Well, this is a slick finish, you know how a regular carport is. Q. What kind of finish is it? You say it's a slick finish, do you mean it's a smooth finish, or is it cement, asphalt or what is it? A. It's cement. Q. All right, and when you say it's slick, why do you say it's slick? A. You know, really glossy-looking. Q. Is it always that way? A. Yes. Q. Had you been there before? A. Yes. Q. Had you walked over it before? A. Yes. Q. All right, go ahead. A. Mr. Rucker was at the end of the carport cleaning a birdcage, a myna birdcage, and the cage was laying there. I started to get off of the carport and there is a nice little step, it's about an 18-inch step down, and you kind of have to jump to get down there. As I started around I stepped in water and

slipped and sat down on a piece of the metal and fell off of the carport. . . The children had been coming around and going in and out of the door like children will do and there was water on the carport. Q. All right, did you see that water? A. No. Q. Were you looking where you were walking? A. I didn't see the water. Q. Where were you looking then if you didn't see the water, were you looking out in the yard to where she was seated? A. I was talking to Florence, yes. Q. Talking to Florence and looking out there and walking across the carport, is that right? A. I was kind of standing at the end of the carport. Well, I had stopped and talked to her and then as I turned around to walk I stepped in this water. You really can't see anything on the carport. I didn't see the water because of the coloring of the carport. Q. What color is the carport? A. Kind of a grayish. Q. And it is your testimony that you can't see a puddle of water if it's on the carport? A. I guess I am blind. I didn't see it. Well, I didn't notice the water. I didn't see the water. Q. After you fell you could see it, couldn't you? A. I knew it must have been there. Q. And you looked at it and saw it, didn't you? A. Not as soon as it happened. I went into shock. Q. Well, later on when you got out of shock, you were able to look at the carport floor and you were able to look at the carport floor and you were able to see water on it, is that right? A. I never looked again. Q. Beg your pardon? A. I didn't look at it again. Q. You did not look at it again? A. No. Q. How do you know there was water on it then? A. I am a little confused. Q. If you didn't see it, did someone tell you it was there? A. Yes. Q. Who told you? A. Mrs. Rucker, Florence Rucker. Q. When did she tell you that? A. That night. Q. That night? A. Yes. Q. And this happened in late afternoon, is that right? A. Yes. Q. Where were you that night when she told you that? A. At her house. Q. Were you back over at her house that night? A. She wanted me to stay there because I was hurt. Q. . . . What was your name at the time when this happened? A. Martin. My maiden name was Holbrook. Q. You don't have any children by your second husband, Mr. Bryant, is that right? A. That's right. Q. Let me ask you this so that I can understand better; you

said that you came into the carport and you walked over here to the corner of it that looks out over the backyard and the swimming pool, is that right? A. Yes. Q. And you stood there talking to Mrs. Rucker? A. Yes. Q. Then you turned and started to walk where? What were you intending to do and where were you going? A. I was going out to the backyard to sit down and talk with her. Q. All right, and just where was it that you fell? Take the pen now and put an X at the spot on the carport where you fell. A. I slipped and fell and sat down on a piece of metal from the birdcage and then the metal and I kind of fell off of the porch. I ended up on the ground. Q. You ended up on the ground? A. Yes. Q. Well, at the time that you slipped were you in the process of stepping down off of the porch? A. No, I hadn't. Q. You held out your hands about the length of a ruler, about a foot, is that right? A. I'd just gotten up a good step and started walking after I stood and talked to Mrs. Rucker. Q. You say you slipped and fell, now, which one of your feet slipped, or just what is your recollection about that? A. My right foot slipped and I sat down. Q. All right, did it slip forward or backward or do you recall? A. Forward. Q. And you sat down on your fanny? A. Yes. Q. And you received a cut in the, was it your right leg? A. My right leg. Q. They took you to the hospital from there? A. Yes. Florence drove me to the hospital. Q. . . This happened in July at around 5:30 p.m., there was still plenty of daylight, wasn't there? A. Plenty of daylight. Q. The carport was not dark? A. Not with the night, no. Q. And you had no trouble seeing where you were going? A. No. Q. I mean as far as light is concerned you had no trouble seeing where you were going? A. No. Q. The sun was still up? A. Yes. Q. And is your eyesight all right as far as you know? A. Yes. Q. Do you wear glasses? A. On occasions. Q. What do you wear them for? A. Night driving. Q. Night driving? A. Yes. Q. Is your—A. I don't wear them very often. I mean—they give me a headache themselves. Q. Well, were you having trouble seeing at distances, is that the reason you got the glasses, or were you having trouble seeing things close up? A. At a distance. Q. At a distance? A. Yes. Q. You never wear them except

maybe to drive, is that correct? A. That's right. Q. Was there anybody else in the carport, other than John [Joan] and Mr. Rucker, at the time that you fell? A. No. Q. Did Mr. Rucker see you fall? A. Yes. Q. Were you ever knocked out in the fall? A. No. Q. How were you dressed that day? A. I had on a T-shirt and shorts, Bermuda shorts and tennis shoes. Q. Tennis shoes? A. Yes. Q. Any particular brand of tennis shoes, were they Keds, or just tennis shoes? A. Keds, I guess, yes. Q. What kind of soles did they have, did they have rubber or crepe soles or what kind? A. Rubber. Q. Had you had them long? Were they new or old or what? A. Average age, I guess. They weren't brand-new. I hadn't just bought them. Q. Did you have any conversation with Mrs. Rucker or Mr. Rucker that you recall, that is conversation about your fall that night or later on that afternoon? A. That particular day you mean? Q. Yes, that particular day. A. No, I went to sleep. Q. Have you had any conversation with them about your fall at any time since you fell? A. Yes. Q. All right, tell me where and when the conversation was. A. I am not good at dates, but one evening we were discussing this accident again and she had told the boy that I married, later married, who was at the hospital at the time, that her little girl had fallen in the same spot that I fell just a few minutes before. We discussed that. We talked about that. Q. Did she say how long it had been before you came along that she had fallen, whether it had just happened or had been several hours or what is your best recollection about that? A. Shortly before that she had fallen. Q. Just shortly before that? A. Yes. Q. You don't know what actually she meant by shortly then? A. That day. Q. That day? A. Yes. Q. Now, you say that Mr. Bryant was with you? A. No. Mrs. Rucker called him. Q. She called him? A. Called him at his apartment and told him that I had been hurt. I was dating him at the time. Q. I see. A. She knew that he would be concerned, so he came up to the hospital and she and him sat out in the room while the doctor sewed my leg up. Q. Did he hear also the fact that one of the children had fallen there shortly before you did? A. Yes, Florence told him that. Q. She told him that? A. Yes. Q. When did she

tell him that, do you know? A. The day that it happened, while I was in surgery or being sewed up."

The trial judge granted the defendants' motion for summary judgment and the plaintiff appealed.

The gist of the arguments of the respective parties on appeal seems to be based primarily on whether or not the plaintiff was an invitee or licensee. See, in this connection, *Code* §§ 105-401, 105-402; *Wittke v. Horne's Enterprises*, 118 Ga. App. 211, 219 (162 SE2d 898); *Patterson v. Thomas*, 118 Ga. App. 326 (163 SE2d 331); *Stanton v. Grubb*, 114 Ga. App. 350 (151 SE2d 237); *Laurens v. Rush*, 116 Ga. App. 65, supra; *King v. Central of Ga. R. Co.*, 107 Ga. 754 (33 SE 839); *Central of Ga. R. Co. v. Hunter*, 128 Ga. 600 (58 SE 154); *Jones v. Asa G. Candler, Inc.*, 22 Ga. App. 717 (97 SE 112); *Hall v. Capps*, 52 Ga. App. 510, supra; *Kinnebrew v. Ocean Steamship Co.*, 47 Ga. App. 704 (171 SE 385); *McCall v. McCallie*, 48 Ga. App. 99 (171 SE 843); *Flint River Cotton Mills v. Calley*, 71 Ga. App. 288 (20 SE2d 426); *Martin v. Henson*, 95 Ga. App. 715 (99 SE2d 251); *Campbell v. Eubanks*, 107 Ga. App. 527 (130 SE2d 832).

As we view the case, it is unnecessary to make that determination, as it is our opinion the trial court erred in granting a summary judgment for the defendants whether we consider the plaintiff to be a licensee or invitee.

1. We are not here determining whether the plaintiff's deposition proved her case as laid, as we would be if this case were appealed from a directed verdict upon a trial, but rather we must determine (first) whether the defendants, by use of such deposition, pierced the allegation of the plaintiff's petition, and (secondly, after the first has been accomplished) does the evidence demand a finding for the defendants as a matter of law. In our opinion, the first has not yet been accomplished and we are, therefore, not concerned with the second under the facts here.

" 'The purpose of the Summary Judgment Act of 1959 is to eliminate the necessity for a trial by jury where, giving the opposing party the benefit of all reasonable doubts and all favorable inferences that may be drawn from the evidence, there is no genuine issue as to any material fact, and the moving

party is entitled to a judgment as a matter of law.' *Holland v. Sanfax Corp.*, 106 Ga. App. 1 (1) (126 SE2d 442).

"Until the moving party produces evidence or materials which prima facie pierce the pleadings of the opposing party, no duty rests upon the opposing party to produce any counter evidence or materials in affirmative support of its side of the issue as made by the pleadings. Moore's Federal Practice, Vol. 6, par. 56.15 [3], p. 2347, n. 46; *Shadix v. Dowdney*, 117 Ga. App. 720 (162 SE2d 245)." *Southern Bell Tel. & Tel. Co. v. Beaver*, 120 Ga. App. 420 (1, 2) (170 SE2d 737).

"The defendant having made the motion, the burden was upon him to produce evidence which conclusively eliminated all issues in the case including the question of the defendant's knowledge of the alleged dangerous condition." *Colonial Stores v. Wilson*, 118 Ga. App. 120, 122 (162 SE2d 750). See also *Sanders v. Alpha Gamma Alumni Chapter*, 106 Ga. App. 137 (126 SE2d 545); *Lucas v. Mixon*, 116 Ga. App. 146 (156 SE2d 375); *Peacock v. Adams*, 118 Ga. App. 728 (1) (165 SE2d 664). The defendant must produce evidence which conclusively negates at least one essential element entitling plaintiff to a recovery under every theory fairly drawn from the pleadings and the evidence. *Saunders v. Vikers*, 116 Ga. App. 733 (2) (158 SE2d 324); *Calhoun v. Eaves*, 114 Ga. App. 756, 759 (152 SE2d 805).

"In order to pierce allegations of material fact contained in the plaintiff's petition, the evidence offered by defendant on motion for summary judgment must unequivocally refute those allegations and must clearly show what is the truth of the matter alleged. It is not sufficient if the evidence merely preponderates toward defendant's theory rather than plaintiff's or does no more than disclose circumstances under which satisfactory proof of plaintiff's case on trial will be highly unlikely." *Watkins v. Nationwide Ins. Co.*, 113 Ga. App. 801, 802 (149 SE2d 749); *Shadix v. Dowdney*, 117 Ga. App. 720, supra; *Woody v. Ralston Purina Co.*, 117 Ga. App. 352 (160 SE2d 662).

It has oft times been held that a motion for summary judgment is analogous to a motion for a directed verdict. "The operation of the motions is, then, essentially the same in reference

to those issues upon which the movant for summary judgment would have, at trial, the burden of proof. The operation is, however, somewhat different where the motions are made by the opponent of the party with the trial burden. Assume, for example, that the movant is the defendant who is attacking the merits of plaintiff's claim. On motion for directed verdict the party resisting the motion, i.e., the plaintiff, has had to and has presented his evidence, which is then scrutinized by the motion. On motion for summary judgment by a defendant on the ground that plaintiff has no valid claim, the defendant, as the moving party, has the burden of producing evidence, of the necessary certitude, which negatives the opposing party's (plaintiff's) claim. This is true because the burden to show that there is no genuine issue of material fact rests on the party moving for summary judgment, whether he or his opponent would at trial have the burden of proof on the issue concerned; and rests on him whether he is by it required to show the existence or non-existence of facts." Moore's Federal Practice, Vol. 6 (2d Ed.), par. 56.15 [3], pp. 2335, 2341. See also *Colonial Stores v. Turner,* 117 Ga. App. 331, 333 (160 SE2d 672); *Sanfrantello v. Sears, Roebuck & Co.,* 118 Ga. App. 205, 206 (163 SE2d 256); *International Brotherhood v. Newman,* 116 Ga. App. 590, 592 (158 SE2d 298). " 'A summary judgment upon motion therefor by a defendant in an action should never be entered except where the defendant is entitled to its allowance beyond all doubt. To warrant its entry the facts conceded by the plaintiff, or demonstrated beyond reasonable question to exist, should show the right of the defendant to a judgment with such clarity as to leave no room for controversy, and they should show affirmatively that the plaintiff would not be entitled to recover under any discernible circumstances. . . A summary judgment is an extreme remedy, and under the rule, should be awarded only when the truth is quite clear.' Traylor v. Black, Sivalls & Bryson, 189 F2d 213, 216." *Watkins v. Nationwide &c. Ins. Co.,* 113 Ga. App. 801, 802, supra.

It appears, therefore, that the grant of a summary judgment may be improper where, at the trial, the grant of a directed verdict may be proper. Armco Steel Corp. v. Realty Investment Co., 273 F2d 483.

2. We next come to the question of what are the material issues in the case, (1) when we assume the plaintiff is an invitee and, (2) when we assume the plaintiff is a licensee. In order to do this it is necessary that we review, to some extent, the law in reference to both theories of recovery. "Where the owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries occasioned by his failure to exercise ordinary care in keeping the premises and approaches safe." *Code* § 105-401. "A licensee is a person who is neither a customer, nor a servant, nor a trespasser, and does not stand in any contractual relation with the owner of the premises, and who is permitted expressly or impliedly to go thereon merely for his own interest, convenience or gratification. The owner of such premises is liable to a licensee only for wilful or wanton injury." *Code* § 105-402.

"The liability of the owner or proprietor of premises, for injuries received by persons while present upon such premises, may be viewed in four aspects: (1) Where the person injured is there as a trespasser; (2) where he is there as a licensee; (3) where he is there by invitation of the owner or proprietor; (4) where he is there under some other special relation. In the first case—that of the trespasser—liability arises only where the injury has been occasioned by the wilful and wanton negligence of the proprietor or owner. No duty of anticipating his presence is imposed; and, as was pointed out by this court in *Charleston & W. C. R. Co. v. Johnson*, 1 Ga. App. 441 (57 SE 1064), the duty to use ordinary care to avoid injuring him after his presence and danger is actually known is, in point of fact, merely the duty not to injure him wantonly or wilfully. So in the first case wanton or wilful negligence is essential to liability. In the second case—that of the licensee—there is a slightly higher duty on the part of the owner or proprietor of the premises. He must not wantonly and wilfully injure the licensee; and since his presence as a result of his license is at all times probable, some care must be taken to anticipate his presence, and ordinary care and diligence must be used to prevent injuring him after his presence is known or reasonably should be anticipated. The fundamental

concept in this class of cases, as in that of trespassers, is of a liability only for wilful or wanton injury; but it is usually wilful or wanton not to exercise ordinary care to prevent injuring a person who is actually known to be, or reasonably is expected to be, within the range of a dangerous act being done. See *Southern R. Co. v. Chatman*, 124 Ga. 1026 (53 SE 692, 6 LRA (NS) 283). To the licensee, as to the trespasser, no duty arises of keeping the usual condition of the premises up to any given standard of safety, except that they must not contain pitfalls, man-traps, and things of that character." *Mandeville Mills v. Dale*, 2 Ga. App. 607, 609 (58 SE 1060).

"The distinction between the duty to a licensee and to one entering the premises under invitation is thus expressed in Beehler v. Daniels, 18 R. I. 563, 565 (29 A 6, 27 LRA 512, 49 ASR 790) : 'There is a clear distinction between a "license" and an "invitation" to enter premises, and an equally clear distinction as to the duty of an owner in the two cases. An owner owes to a licensee no duty as to the condition of premises, unless imposed by statute, save that he should not knowingly let him run upon a hidden peril, or wilfully cause him harm; while to one invited he is under obligation for reasonable security for the purposes of the invitation.' Mere permission to enter the premises creates the relation of licensee; invitation, express or implied, is necessary to create the more responsible relation and the consequent higher duty upon the owner or proprietor. In this class of cases wilfulness or wantonness is not necessary to the existence of liability, but merely ordinary neglect, either through act of omission or of commission. See *Atlanta Cotton-Seed Oil Mills v. Coffey*, 80 Ga. 145 (4 SE 759, 12 ASR 244) ; *Archer v. Blalock*, 97 Ga. 719 (25 SE 391) ; *Central R. Co. v. Robertson*, 95 Ga. 430 (22 SE 551). The case of *Augusta R. Co. v. Andrews*, 89 Ga. 653 (16 SE 203), s.c. 92 Ga. 706 (19 SE 713), is authority, not for the proposition that mere permission is equal to an invitation, but for the proposition that a duty is owing to a licensee." Id., p. 611. The owner or occupier of premises is liable for failure to warn invitees of dangers or defects in them or instrumentalities thereon, of which the owner or occupier knew or of which it was his duty to know in the exercise of ordi-

nary care in keeping the premises safe. *Fulton Ice &c. Co. v. Pece,* 29 Ga. App. 507 (116 SE 57); *Indian Springs Swimming Pool Corp. v. Maddox,* 70 Ga. App. 842, 845 (29 SE2d 724); *Lenkeit v. Chandler,* 97 Ga. App. 769, 770 (104 SE2d 476). "The owner of premises owes to a licensee no duty of keeping the condition of the premises up to any given standard of safety except that they must not contain pitfalls or mantraps or things of that character." *Kinnebrew v. Ocean Steamship Co.,* 47 Ga. App. 704 (2) (171 SE 385) and while it is true that an owner of premises owes to a licensee a slightly higher duty than that owed to a trespasser, his obligation is not equal to the duty which he owes to an invitee, and implied notice of the defect is insufficient to show a breach of duty owing to a licensee. Id., p. 706. As to a licensee the owner or occupier is under no duty to inspect the premises.

This quick review of the law lets us determine the elements necessary, and alleged by the plaintiff, which constitute a cause of action under either theory and what the defendants in their motion for summary judgment must affirmatively negate in whole or in part.

3. Let us assume first that she is an invitee. The evidence discloses there was a defect in the premises so the defendants have failed to pierce this allegation. Did the defendants lack knowledge of this defect? On the contrary, the evidence affirmatively shows that Mrs. Rucker knew of the presence of the water and that her daughter had previously slipped and fallen because of it. The evidence does not negative Mr. Rucker's personal knowledge of the defect and neither does it negative his implied knowledge of the defect although it might fail to prove implied knowledge should the burden here be on the plaintiff. The defendant here does not pierce the pleadings by producing evidence which merely *fails to prove* the plaintiff's case, even though that evidence be the plaintiff's testimony.

On the question of the failure to warn of the defect the evidence shows conclusively that neither Mr. nor Mrs. Rucker warned the plaintiff, therefore, instead of piercing this allegation of the plaintiff's petition the defendants' evidence proved it.

4. Let us now assume that the plaintiff was a licensee. The

burden would then be on the defendants to (1) show there was no mantrap, pitfall or other like situation or (2) that if there was such a situation they had no knowledge of it or (3) that if there was such a situation and they had knowledge of it they warned the plaintiff. There is no question that no warning was given, so as to this the petition stands unquestioned. The same may be said as to the allegations of the petition that both parties had actual knowledge of the defective condition.

The next question is whether the evidence shows there was no pitfall or mantrap, for if the evidence shows affirmatively a lack of such a pitfall or mantrap the defendants have pierced the pleadings and in the absence of counter evidence by the plaintiff or other evidence making an issue for the jury, the defendant would be entitled to judgment.

While the courts of this State have been reluctant to declare a statical condition of the premises a mantrap even though it consists of a peril concealed by darkness (*Kahn v. Graper*, 114 Ga. App. 572, 575 (152 SE2d 10)), here we have no statical condition of the premises, and a portion of the condition (the water on the floor) was obscured because of the coloration and the prior brightness of the floor even in the absence of the water. The floor thus made slippery by the water *with the sharp metal object adjacent thereto* constituted the dangerous condition. As was said in *Kahn v. Graper*, supra (p. 576), "[t]he doctrine of mantrap or pitfall is rested upon the theory that the owner is expecting a trespasser or licensee and has prepared the premises to do him injury. Moseley v. Alabama Power Co., 246 Ala. 416 (21 S2d 305). . . This may happen where the owner has deliberately set a trap gun, or has concealed a danger, hiding it with some cover insufficient to prevent injury. It may result from a knowledge of the owner of the existence of the dangerous condition coupled with a conscious indifference to the consequences, so that an intent to inflict injury is inferable. *Louisville &c. R. Co. v. Young*, 112 Ga. App. 608, 613 (145 SE2d 700)." It is our opinion that under the showing here, where we must assume (the pleadings not having been pierced in that regard) that the owners had knowledge of this dangerous condition and that shortly prior thereto their daughter had slipped and fallen

at the same location, and that with this knowledge the husband, with the knowledge of the wife, placed a sharp piece of metal adjacent to the slippery place on the floor, we can not say that under this situation a jury would not be authorized to find that a mantrap had been created and that failure to warn thereof constituted a conscious indifference to the consequences so as to amount to a wilful and wanton act.

Accordingly, this court should hold that the defendants failed to pierce the pleadings and that there are material issues of fact still remaining in the case made primarily by the unpierced pleadings. We think the trial court erred in granting the defendants' motion for summary judgment and that the judgment should be reversed.

DEEN, Judge, dissenting. Unless *Hall v. Capps,* 52 Ga. App. 150, supra, is overruled, the law of this State is settled that one who comes on the premises of another not "for a purpose connected with the business in which the occupant is engaged" and without "mutuality of interest in the subject to which the visitor's business relates" is a licensee regardless of whether the owner's invitation to come is express or implied. This ruling by Judge Jenkins has been explicitly followed by Judge Jordan in *Stanton v. Grubb,* 114 Ga. App. 350, supra, and by Judge Hall in *Laurens v. Rush,* 116 Ga. App. 65, supra. I do not consider any of the other cited cases absolutely controlling. "Business" as used in these cases clearly refers to pecuniary gain. It might easily have had a broader significance, as witness *Griffin v. Russell,* 144 Ga. 275 (87 SE 10, LRA 1916F 216, AC 1917D 994), the parent case for the family-car doctrine, which held that "defendant might properly make it an element of his business to provide pleasures for his family" (p. 282), so that a minor child using the car for her own pleasure with the father's permission was engaged in his "business." Judge Lumpkin commented: "The word 'business' is commonly employed in connection with an occupation for livelihood or profit, but it is not limited to such pursuits. When Jesus said, 'Wist ye not that I must be about my Father's business?' He had no reference to matters involving pecuniary rewards." P. 278.

It occurs to me that the language of *Code* § 105-401 making

an owner liable for those on his lands "for any lawful purpose" and "by express or implied invitation" was not originally intended to limit the invitation to business activities in the literal sense. My reason is that Code § 105-401 was codified from *Atlanta Cotton Seed Oil Mills v. Coffey*, 80 Ga. 145 (4 SE 759, 12 ASR 244). In that case, although the defendant ran a business, he was not engaged in business with the plaintiff who had applied for and been granted permission by him to remove some waste material gratis for use in an orphan's home. Judge Simmons quoted from Cooley on Torts the language which is now *Code* § 105-401 and added: "Judge Cooley . . . says that when one 'expressly or by implication, invites others to come upon his premises, whether for business *or for any other purpose,* it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit.'" P. 148. In the *Coffey* case two things should be noted: (1) it was based on negligence in the use of property, in that an acid became dissolved in mud or water and injured a horse's hooves, and (2) the plaintiff was invited on the premises but only for his own benefit. I would therefore be willing to apply *Code* § 105-401 in the sense in which I think it was intended with the result that lack of ordinary care would render the owner liable to an express invitee, whether a social guest or otherwise.

I agree with the majority opinion that plaintiff cannot recover under the licensee theory, but think he should be entitled to go to a jury under the theory that plaintiff might be able to prove the lack of ordinary care to which I think he should be entitled.