**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and DILLARD, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 15, 2014**

# In the Court of Appeals of Georgia

A14A0425. ROGERS v. WOODRUFF.

DILLARD, Judge.

In this interlocutory appeal, Janice D. Rogers challenges the trial court's denial of her motion for summary judgment on Cory Woodruff's personal-injury claims related to an incident that occurred at Rogers's home when a deck railing gave way and Woodruff fell to the concrete below, resulting in serious injuries. On appeal, Rogers argues that the trial court erred in denying her motion for summary judgment. For the reasons set forth *infra*, we agree and reverse.

Viewed in the light most favorable to Woodruff,[1] the nonmovant, the record reflects that on the night of July 20, 2008, Woodruff was a social guest at the home

---

[1] *See, e.g.*, *Cmty. Marketplace Props., LLC v. SunTrust Bank*, 303 Ga. App. 403, 404 (693 SE2d 602) (2010).

of Janice Rogers. More specifically, Woodruff, who was then a college student at the University of West Georgia, was visiting with Rogers's daughter, Kelly, also a student, at Kelly's apartment located above her parents' detached garage. It is undisputed that Janice Rogers purchased the property in 2006, and the stairway and deck leading up to the apartment over the detached garage were built in 1996 by the property's previous owner, who was a residential builder and who swore by affidavit that the county inspected the improvements not long after construction.

Earlier on the day in question, Woodruff and Kelly visited her parents who were away from home, camping overnight at a lake. But after this visit, Woodruff and Kelly went back to her apartment and got ready to go out to a bar in nearby downtown Carrollton. Along with another friend, Deanna Echols, Woodruff and Kelly made their way to the bar, where they danced and consumed alcoholic beverages until approximately 2:30 a.m. The amount of alcohol that Woodruff consumed both before and after arriving at the bar is hotly disputed, with Woodruff claiming that he imbibed only two drinks at the bar and nothing before and others testifying that Woodruff consumed multiple alcoholic beverages at the bar, including up to four shots of liquor, and that he consumed liquor at the apartment before heading out for the evening.

What is undisputed is that while at the bar, the trio of friends ran into Devan Hayes, who Woodruff and Kelly knew from school and who was working as a bouncer that night. And although Kelly considered Woodruff a close friend, Woodruff had deeper feelings for Kelly and became visibly upset over the course of the evening as she increasingly directed her attention toward Hayes. Indeed, at one point after 2:00 a.m., an emotionally distraught Woodruff telephoned his father from the bar's parking lot because he was so grieved by the situation (particularly because Woodruff believed Hayes had treated girls poorly in the past).

Not long after this call, Kelly, Echols, and Hayes found Woodruff in the parking lot and, before heading back to the apartment, Kelly invited Hayes to join them there after he was done working. It is again highly disputed as to how much alcohol Woodruff consumed upon returning to the apartment, with Woodruff denying that he had anything alcoholic to drink, and Kelly, Echols, and Hayes (who arrived at 3:30 a.m.) all testifying that Woodruff, although already highly intoxicated, continued to imbibe multiple shots and mixed drinks. The tenor between Hayes and Woodruff at this point is also disputed, with Kelly and Echols contending that Woodruff was an out-of-control drunk who was openly hostile toward Hayes, and

3

both Hayes and Woodruff contending that the two were on much more congenial terms.

Nevertheless, although the atmosphere surrounding the decision to do so is disputed, it is undisputed that Hayes and Woodruff went outside of the apartment after 4:00 a.m. According to Woodruff, he wanted to discuss how Hayes should treat Kelly. And because Kelly's apartment was located above her parents' garage, it was accessible only by an exterior stairway with a somewhat spacious deck landing at the top entrance to the abode. Hayes and Woodruff were on this landing when the incident causing Woodruff's injuries occurred, while Kelly and Echols remained inside the apartment.

According to Kelly and Echols, Woodruff and Hayes were outside only briefly before the women heard loud voices, saw and heard Hayes get slammed up against the door, and then heard another loud sound that, upon exiting the apartment, they surmised must have been Woodruff falling through the deck railing to the ground below. Woodruff, on the other hand, testified that while he could recall nothing after he hit the ground, the fall occurred after he leaned up against the railing. He also

4

flatly denied fighting with Hayes. As for Hayes, he testified that Woodruff fell after stumbling backwards and falling into the railing, but he too denied fighting.[2]

Woodruff was seriously injured as a result of the fall and subsequently filed suit against Kelly Rogers's parents, Janice and Darryl.[3] During the course of discovery, Woodruff deposed an expert in construction, who testified that his examination of the deck and railing revealed that the railing violated building-code requirements for minimum height and load capacity. The Rogers eventually filed a motion for summary judgment, which the trial court denied as to Janice but granted as to Darryl because the evidence established that Janice (hereinafter "Rogers") was the sole owner of the property where the incident occurred. Specifically, the trial court found that genuine issues of material fact existed as to whether Rogers breached a duty owed to Woodruff by failing to have the deck inspected when there was evidence that the deck was not built to code. We granted Rogers's application for interlocutory appeal, which we now consider.

---

[2] We note in passing that it is undisputed that following Woodruff's fall, Hayes immediately and heroically rendered aid to Woodruff until paramedics arrived, perhaps saving Woodruff's life.

[3] Woodruff also filed suit against Devan Hayes, but he is not a party to this appeal.

At the outset, we note that on appeal from the denial of a motion for summary judgment, we view the evidence *de novo* in the light most favorable to the nonmoving party.[4] Of course, summary judgment is appropriate when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[5] With this guiding principle in mind, we turn now to Rogers's enumerations of error on appeal.

Rogers contends that the trial court erroneously identified the standard of care owed to Woodruff, a licensee, when the deck railing was a static condition and, accordingly, misapplied the law to the facts.

It is undisputed that Woodruff was visiting Rogers's property as a social guest and, therefore, he was a licensee under Georgia law.[6] A property owner incurs liability for breaching a duty to a licensee "only for wilfully or wantonly allowing a

---

[4] *See, e.g.*, *Cmty. Marketplace Props., LLC*, 303 Ga. App. at 404 ("We apply a de novo standard of appellate review and view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." (punctuation omitted)).

[5] *Id.* (punctuation omitted).

[6] *See Thompson v. Oursler*, 318 Ga. App. 377, 378 (733 SE2d 359) (2012) ("Georgia has adopted the rule that a social guest is not an invitee but is a licensee." (punctuation omitted)); *see also* OCGA § 51-3-2 (a) (defining the characteristics of a "licensee"); *Trulove v. Jones*, 271 Ga. App. 681, 681 (1) (610 SE2d 649) (2005) (noting that a social guest is a licensee).

dangerous static condition . . . to cause his injuries."[7] And "wanton conduct" has been described as "that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent to do harm or inflict injury."[8] Furthermore, a property owner has no duty to a licensee to keep his or her premises up to any standard of safety, "except that [it] must not contain pitfalls, mantraps, and things of that type."[9]

Here, the deck and railing did not amount to a mantrap or pitfall, the doctrine of which is "rested upon the theory that the owner is expecting a trespasser or a licensee and has prepared the premises to do him injury."[10] Indeed, a mantrap or pitfall is a "contrivance so dangerous in character as to imply a disregard of

---

[7] *Thompson*, 318 Ga. App. at 378; *see also* OCGA § 51-3-2 (b) ("The owner of the premises is liable to a licensee only for willful or wanton injury."); *Trulove*, 271 Ga. App. at 681 (1) ("[Appellant] was a social guest or licensee on the premises, and as such [Appellee] can only be liable for wilful or wanton injury.").

[8] *Trulove*, 271 Ga. App. at 681 (1) (punctuation omitted).

[9] *Id.* at 682 (1) (punctuation omitted).

[10] *Frank Mayes & Assoc., Inc. v. Massood*, 238 Ga. App. 416, 418-19 (2) (518 SE2d 903) (1999) (punctuation omitted); *accord Mansfield v. Colwell Constr. Co.*, 242 Ga. App. 669, 672 (530 SE2d 793) (2000).

consequences or a willingness to inflict injury"[11]—for example, a vending machine booby-trapped with dynamite to discourage theft.[12] Rogers argues that the deck and railing in the case *sub judice* constituted a static condition, which is "one that does not change and is dangerous only if someone fails to see it and walks into it."[13] The trial court *did* determine that the deck's railing was a static condition; however, the court also determined that there was evidence that the railing in question was defective. And relying upon our decision in *Hicks v. Walker*,[14] the trial court denied Janice Rogers's motion for summary judgment.

Like the trial court, we also find that the deck amounted to a static condition;[15] however, as in *Hicks*, the alleged cause of the injury—underlying defective

---

[11] *Massood*, 238 Ga. App. at 419 (2) (punctuation omitted); *see also Mansfield*, 242 Ga. App. at 672 ("Examples of a mantrap include a spring gun or a trap or a dangerous condition hidden with sufficient cover to obscure it or to render it unobservable to one who approaches it." (punctuation omitted)).

[12] *McKinsey v. Wade*, 136 Ga. App. 109, 111 (5) (220 SE2d 30) (1975).

[13] *Bullard v. Marriott Int'l, Inc.*, 293 Ga. App. 679, 681 (2) (667 SE2d 909) (2008) (punctuation omitted).

[14] 262 Ga. App. 216 (585 SE2d 83) (2003).

[15] *See Thompson*, 318 Ga. App. at 378 (deck was a static condition); *Trulove*, 271 Ga. App. at 682 (1) (deck with missing railing was a static condition); *Davis v. Scott*, 232 Ga. App. 493, 493 (502 SE2d 332) (1998) (stairway was a static condition).

8

construction—is more akin to a hidden peril.[16] Nevertheless, we conclude that the trial court erred in denying summary judgment by relying upon *Hicks.*

In *Hicks*, we noted the general duty that a property owner owes to a licensee (*i.e.*, not to wilfully or wantonly injure a licensee)[17] and then quoted the well-established principle that it is "usually wilful or wanton not to exercise ordinary care to prevent injuring a person who is actually known to be or may reasonably be expected to be, within range of a dangerous act being done or a hidden peril on one's premises."[18] Additionally, we emphasized that a property owner is subject to liability for physical harm caused to a licensee by a condition on the property owner's land if, but only if,

> (a) the possessor knows or *has reason to know* of the condition and should realize that it involves an unreasonable risk of harm to licensees, and should expect that they will not discover or realize the danger, and

---

[16] *See Bragg v. Missroon*, 186 Ga. App. 803, 804-05 (368 SE2d 564) (1988) (affirming denial of motion for summary judgment when decedent was electrocuted while ascending ladder on dock beside boathouse equipped with electrical door with wiring defects).

[17] 262 Ga. App. at 218.

[18] *Id.*; *accord Thompson*, 318 Ga. App. at 378.

9

(b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved.[19]

Regrettably, in *Hicks*, we neglected to mention the third requirement, which is that "(c) the licensees do not know or have reason to know of the condition and the risk involved."[20]

---

[19] *Hicks*, 262 Ga. App. at 218; *accord Thompson*, 318 Ga. App. at 378; *Bragg*, 186 Ga. App. at 804.

[20] *Thompson*, 318 Ga. App. at 378 (punctuation omitted); *accord Bragg*, 186 Ga. App. at 804. In *Hicks*, we also invoked the principle that "[a]fter the presence of a licensee is known, exactly the same acts of caution may be required of the owner to satisfy the legal duty as would be necessary if the licensee were invited," 262 Ga. App. at 218, before citing duties ordinarily owed by property owners to *invitees*, not licensees, *see id.* at 218 & n.12 (citing *Freyer v. Silver*, 234 Ga. App. 243, 245 (2) (507 SE2d 7) (1998), for the proposition that "[i]n cases of defective construction, the owner is presumed to have notice of the danger"); *id.* at 218 & n.13. (citing *Freyer*, 234 Ga. App. at 245 (2), for the proposition that an "owner's duty to exercise ordinary care includes inspecting the premises to discover possible dangerous conditions of which the owner does not have actual knowledge, and taking reasonable precautions to protect invitees from dangers foreseeable from the use of the premises"); *id.* at 218 & n. 15 (citing *Long Leaf Indus. v. Mitchell*, 252 Ga. App. 343, 346-47 (3) (a) (556 SE2d 242) (2001), for the proposition that "evidence of nonconformity with code standards may be proof of a landowner's superior knowledge of a defect under OCGA § 51-3-1," which Code section applies to invitees). *But see Bryant v. Rucker*, 121 Ga. App. 395, 409 (2) (173 SE2d 875) (1970) ("As to a licensee the owner or occupier is under no duty to inspect the premises."). As will be clear from our discussion *infra*, the use of this precedent in *Hicks* was entirely unnecessary to the holding in that case —*i.e.*, that under the unique facts of *Hicks*, there was evidence by which the jury could find that the property owners had constructive knowledge of the deck's defects. Accordingly, any reference to these duties in *Hicks* is dicta and of

The facts in *Hicks* involved a 2-year-old child who was injured in a deck collapse during a barbeque hosted by the property owners.[21] And although there was no evidence that the property owners had *actual* knowledge of the deck's dangerous condition,[22] we held that genuine issues of material fact existed as to whether the owners had constructive knowledge of such defects and whether they exercised ordinary care.[23] Indeed, the facts established that the property owners' son had recently built the deck, the deck was not built in accordance with codes in force at the time of construction, and the deck would not have passed an inspection.[24] Thus, under

no precedential utility. *See Hoesch Am., Inc. v. Dai Yang Metal Co.*, 217 Ga. App. 845, 847 (1) (459 SE2d 187) (1995) (indicating that the term "dicta" refers to language in a judicial opinion that is "unnecessary to the holding of the case").

[21] 262 Ga. App. at 216-17.

[22] *Id.* at 219.

[23] *Id.*

[24] *Hicks*, 262 Ga. App. at 217-18. Specifically, as to the allegedly defective construction, the facts showed that

the deck failed at the point at which the deck was attached to the house, and the deck had been attached to the house with carpentry nails, though the codes required the use of hex bolts; contrary to code requirements, no flashing was used to protect the wood from water damage, and the wood was damaged as a result; the support posts were set on top of

11

the facts of *Hicks*, genuine issues of material fact remained as to whether the owners failed to exercise ordinary care to protect the injured child–licensee from the hidden peril of the defective deck because there was evidence by which a jury could have determined that the property owners *should have known* of the deck's condition.

In stark contrast, here, the undisputed evidence shows that although one person testified that he had previously noticed that the *stairway* railing was wobbly, neither Kelly Rogers nor her parents were aware of any problem with the stairway or *deck* railing. And Woodruff himself testified that he saw no visible problem with the railing. Accordingly, there was no evidence of actual knowledge. Additionally, there was no evidence by which a jury could find *constructive* knowledge. Indeed, although Woodruff presented expert testimony to establish that the deck railing did not meet building-code standards in 2008, the expert witness did not know when the deck was built. Instead, the undisputed evidence showed that the deck was built by a prior owner of the property in 1996 and that the county inspected the improvement at that

---

cinder blocks instead of being set into a foundation sufficient to support the weight load of the deck; and the posts were improperly "toe-nailed" into the deck.

*Id.* at 217.

time. And there was no evidence to show that the deck did not meet applicable building-code standards when it was constructed in 1996 and inspected by the county.[25]

Thus, because the undisputed evidence established that the deck and railing in question were built by a previous property owner ten years prior to Rogers's purchase of the property and that the county inspected the improvement soon after its construction, we find the facts in the case *sub judice* wholly inapposite to those at issue in *Hicks v. Walker*.[26] Accordingly, because there is no evidence by which Rogers could be said to have superior knowledge of the deck railing's allegedly

---

[25] *Cf. Chisholm v. Fulton Supply Co.*, 184 Ga. App. 378, 379 (1) (361 SE2d 540) (1987) ("Appellant's allegations as to a defect in the steps because of their construction is not supported by Atlanta's adoption of its Building Code in 1983 when the building was built in 1922. The stairs were legal as a nonconforming use." (punctuation omitted)); *Ray v. Gallant-Belk Co. of Elberton*, 147 Ga. App. 580, 581 (2) (249 SE2d 635) (1978) ("The stairs in question had been built over forty years previously and did not meet the standards of the Southern Building Code, which the City of Elberton had adopted by ordinance. They were consequently legal as a nonconforming use.").

[26] 262 Ga. App. 216 (585 SE2d 83) (2003).

13

dangerous condition,[27] the trial court erred in denying her motion for summary judgment.[28]

*Judgment reversed. Doyle, P. J., and Miller, J., concur in judgment only.*

---

[27] *Compare Bragg*, 186 Ga. App. at 805 (affirming denial of motion for summary judgment when evidence established that defects in wiring of electrical door for boathouse were "apparent and stood out" and "visibly defective," creating genuine question of material fact "as to whether appellants *should have known* of the hazards created by the defects in wiring at their boat dock"), *with Barksdale v. Nuwar*, 203 Ga. App. 184, 184-85 (416 SE2d 546) (1992) (affirming grant of motion for summary judgment when evidence established that deck collapsed due to allegedly defective construction, but homeowner had no actual knowledge of defects and there was no evidence of constructive knowledge when deck was professionally built, homeowner personally inspected the deck, and deck appeared to be well constructed).

[28] *See Jordan v. Bennett*, 312 Ga. App. 838, 841 (1) (720 SE2d 301) (2011) (reversing denial of motion for summary judgment in case concerning licensee's fall off of outdoor deck, and holding that "[b]ecause there [was] no evidence . . . that [appellant] wilfully or wantonly injured [appellee] or that he knowingly exposed her to a dangerous activity, hidden peril, pitfall, or mantrap, there [was] no evidence that [appellant] breached his duty of care to [appellee] such that he has any liability for her injuries"); *Ruffin v. Ruffin*, 159 Ga. App. 830, 830-31 (285 SE2d 261) (1981) (affirming grant of summary judgment to property owner on claim for injuries arising out of minor's fall through rotten board on dock when plaintiff alleged, *inter alia*, that board was a hidden peril, but there was no evidence of actual knowledge or evidence to support a jury finding of constructive knowledge).